# Exhibit A.15

 **CHRISTUS** Health.

**Associate Corrective Action Form**



Associate Name: Billy T Green

Job Title: Pharmacy Informaticist

Department: Health Informatics

Location: CHRISTUS Health_Spohn Market

Date of Occurrence: December 16, 2016

Witness(es): Lilliana Saucedo and Ivonne Garcia

The purpose of this Associate Corrective Action form is to provide you with written notice of serious areas of concern, gaps in your work performance, and to reiterate **CHRISTUS Health's** expectations for Associate conduct and job performance in the workplace.

PROGRESSIVE DISCIPLINE PHASE

_____ Documented Verbal      _____ Written      _____ Final      _X_ Termination      _____

_____ A Performance Improvement Plan (PIP) accompanies this Associate Corrective Action form

(Term Code)

KEY BEHAVIORAL / PERFORMANCE CHALLENGES

X
_____ Insubordination _____

Deficiency in Key Competency/
Performance Area :_____

X
_____ Attendance _____ X

Failure to uphold
CHRISTUS Core Value(s): __Integrity
_____

X  Attitude _____
APPLICABLE POLICIES/ PROTOCOLS
Attendance Management Policy
Progressive Discipline Policy

Other:_____

Violation/ Area(s) of Concern:

Violation: Lilliana (via conference call) and I met with Billy Green at 2:39pm. We were scheduled to meet at 2:30pm to provide coaching and discuss some concerns regarding his performance and unauthorized tardiness that occurred on 12/15/16 and 12/16/16. Billy Green became agitated and did not allow Lilliana or me the opportunity to provide coaching or to discuss the matter. We wanted to provide this coaching opportunity to help him identify and overcome any obstacles that have hindered him from excelling at his job.
Area(s) of Concern: Billy Green became hostile and insubordinate to his HI manager, HI Director, and HR Business Partner. The conduct and behavior displayed by Billy Green today were below the CHRISTUS Standards and Core Values: dignity, excellence, and integrity. Although we wanted to create an opportunity to bring attention to his performance and conduct issue, Billy Green refused to discuss or review with his HI manager, HI Divisional Director and HR Business Partner. Billy Green stated as an exempt employee he could work at any time from any place that he chooses. He also stated he doesn't have to come into the office. Billy Green mentioned that he had reached out to my husband via Facebook to encourage me (Erica) to apply for the HI Manager position. He was offered tools of support and assistance by me (HI manager) and the HR Business Partner; he refused stating that he would not need them. He stated that he did not need to protect this job because he could get a job anywhere in the country.

**CHRISTUS 000065**

**Corrective Action Historical Review – (i.e. Observations, Previous Discussions or Counseling):**

Undocumented informal discussion about chain of command related to a previous incident of circumventing the appropriate process for escalating issues on Friday, June 17, 2016.

07/14/16- Associate Corrective Action Form Verbal:  Failure to uphold CHRISTUS Core Value_ Integrity. Reviewed Open Door Policy

07/14/16- Associate Corrective Action Form Written:  Attitude and Unauthorized Absence; Working from Home without permission.  Reviewed Time and Attendance System Policy and Attendance Management Policy

09/28/16- Coaching Document:  Communication on completion of tasks assigned

11/18/16- Associate Corrective Action Form Final:  Email Etiquette and Failure to uphold CHRISTUS Core Value_ Integrity (communication received from Spohn Market Leadership regarding concerns with Billy Green's unprofessional email communication)

12/7/16- Performance Improvement Plan Form:  Email Etiquette and Failure to uphold CHRISTUS Core Value_ Integrity (communication received from Spohn Market Leadership regarding concerns with Billy Green's email communication).  Reviewed Use and Internet and Electronic Mail- CHRISTUS Health Policy.

12/14/16, 12/15/16, and 12/16/16- Scheduled a meeting on 12/16/16 to coach and discuss the incidents (go live initiative communication and unauthorized tardiness) that occurred on identified dates. Planned to review the Attendance Management Policy.

**Management Expectations Going Forward:**

**Associate Comments :**

**CHRISTUS 000066**

**Signatures**

_____     _____     _____
Associate Name (Printed)           Associate Signature                Date

**Signatures:**

_____     _____     _____
Manager Name (Printed)             Manager Signature                  Date

Form Reviewed by the following HR Partner: _____     Date: _____

CHRISTUS 000067

# Exhibit A.16

**From:** Chapa, Erica
**Sent:** Tuesday, December 20, 2016 12:14 PM
**To:** Laughlin, Ivonne
**Cc:** Saucedo, Lilliana; Crunk, Glynda; Webster, Luke
**Subject:** RE: Billy Green - Separation

Thank you for the update.

Erica Rangel Chapa, BSHS, RN
Manager-Spohn
Health Informatics
CHRISTUS Health
600 Elizabeth Street | Corpus Christi | TX 78404
(o) 361. 881. 3089 | (c) ███████████
www.christushealth.org


**From:** Garcia, Ivonne
**Sent:** Monday, December 19, 2016 9:18 AM
**To:** Chapa, Erica
**Cc:** Saucedo, Lilliana; Crunk, Glynda; Webster, Luke
**Subject:** Billy Green - Separation

Good morning Erica,

I contacted Billy this morning to finalize his separation.

He may be reaching out to an HI leader as he is not in agreement with the separation.

Please reach out to me when you return.

Best regards,

Ivonne Garcia, SPHR
Human Resources Business Partner
Human Resources Strategy
CHRISTUS Health
919 Hidden Ridge | Irving | TX  75039
(o) 469.282.2059
www.christushealth.org

1

**CHRISTUS 000230 - CONFIDENTIAL**

CONFIDENTIALITY NOTICE:  Confidential information, such as identifiable patient health information or business information, is subject to protection under state and federal law.  If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information.  If you have received this in error, please reply and notify the sender (only) and delete the message.  Unauthorized interception of this e-mail is a violation of federal criminal law.

2

**CHRISTUS 000231 - CONFIDENTIAL**

# Exhibit A.17

**Laughlin, Ivonne**

| | |
|---|---|
| From: | MSS_noreply@christushealth.org |
| Sent: | Tuesday, December 20, 2016 5:03 PM |
| To: | Brooks, Catrina; Gonzales, Jeffery; Ridgeway-Washington, Ashley; Penaloza, Irma; Nelson, Charleen R.; Bell, Tequlia; Laughlin, Ivonne |
| Subject: | IMPORTANT! CHRISTUS MSS Assignment Notification |

Chapa, Erica has submitted a Work Event - Employment Status Change - Terminate for Green, Billy on Tue Dec 20 18:02:55 EST 2016 which requires your approval. You may review and approve/reject the request by clicking on the following link https://portal.adp.com

1

**CHRISTUS 000062**

# Exhibit A.18



CHRISTUS 000249

# USPS Tracking®

**FAQs ›** **(https://www.usps.com/faqs/uspstracking-faqs.htm)**

## Track Another Package **+**

**Tracking Number:** 70091410000188373934

Remove ✕

Your item was delivered to an individual at the address at 11:17 am on December 24, 2016 in CORPUS CHRISTI, TX 78418.

## ✓ Delivered

December 24, 2016 at 11:17 am
Delivered, Left with Individual
CORPUS CHRISTI, TX 78418

Feedback

---

**Tracking History**                                                                    ⌃

**December 24, 2016, 11:17 am**
Delivered, Left with Individual
CORPUS CHRISTI, TX 78418
Your item was delivered to an individual at the address at 11:17 am on December 24, 2016 in CORPUS CHRISTI, TX 78418.

**December 24, 2016, 7:44 am**
Arrived at Unit
CORPUS CHRISTI, TX 78418

**December 24, 2016, 4:55 am**
Departed USPS Regional Facility
CORPUS CHRISTI TX DISTRIBUTION CENTER

**December 23, 2016, 10:36 pm**
Arrived at USPS Regional Facility
CORPUS CHRISTI TX DISTRIBUTION CENTER

**CHRISTUS 000250**

# Exhibit A.19

BusinessPlans, Inc. - myCobraPlan
COBRA INFORMATION ENCLOSED
432 East Pearl Street
Miamisburg, OH  45342



1/6/2017

BILLY GREEN & Family

CORPUS CHRISTI, TX 78418

Dear BILLY GREEN & Family:

On 12/16/2016, you experienced an event of a/an Termination which constitutes a qualifying event under the
CHRISTUS Health group health plan(s). As a result, your coverage, and that of your covered dependent(s), if any,
will end on the date(s) set forth on the COBRA Continuation Election Form accompanying this letter.  Under the
provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) this entitles you and your
covered dependent(s) if any, to elect to continue coverage (referred to as COBRA coverage) under the plan(s)
enrolled as active member(s). The first day of COBRA coverage and the maximum continuation period is
determined by plan. Please refer to your COBRA Election Form enclosed to determine your first day of COBRA
coverage and maximum continuation period ("Last Day of COBRA").

**How to Elect COBRA Coverage**
Under COBRA, you have a limited number of days to elect continuation coverage. Your election window is
determined by the plan and is calculated from the date your coverage under the plan is lost because of the event
described above or the date this notice of your election rights is sent to you, whichever is later. To elect COBRA
coverage, you must complete and submit the enclosed election form to BusinessPlans, Inc. - myCobraPlan no later
than the Election Period End date ("Last Day to Elect") listed on the enclosed COBRA Election Form. This same
notice is being sent separately to your spouse, if any; however, only one of you needs to elect continuation
coverage for your spouse and dependent child(ren), if any, who wish to continue coverage. Furthermore, because
COBRA gives you the right to elect coverage independently, you, your spouse or dependent child(ren), if any, may
elect single coverage and not include those individuals who do not wish to continue coverage.

In addition to COBRA coverage, other health coverage options may be available to you, such as coverage through
the Health Insurance Marketplace at www.healthcare.gov or 1-800-318-2596. You may also be eligible to enroll in
coverage through Medicaid or another group health plan (like a spouse's plan), if you request enrollment within 30
days of the loss of coverage.

**Payment of COBRA Coverage Premiums**
The current amount of this premium and the due date for payment are explained in the enclosed COBRA Election
Form. The premium may change in the future. We have used the information supplied by CHRISTUS Health to
calculate your maximum continuation period under the plan(s) you were insured prior to your qualifying event. If
there is a discrepancy between our calculation and the underwriting insurance carrier, the insurance carrier always
governs. Please contact your insurance carrier(s) to determine the exact end of your maximum continuation period.

**Length of COBRA Coverage Period**
If you and your spouse or dependent child(ren), if any, elect coverage, it can last for a maximum continuation period
("Last Day of COBRA") described in the enclosed COBRA Election Form beginning on the date of your qualifying
event, or loss of coverage, whichever is later. The first day of COBRA coverage will be determined by the plan. The
continuation period may be extended for the following reasons:

**1. Death of employee, divorce, legal separation or change in dependent status**
If these events occur during the original maximum continuation period of COBRA coverage, the period of coverage
for your spouse and dependent child(ren), if any, may be extended. These events extend the original maximum
continuation period of COBRA coverage only if they would have caused your spouse or dependent child(ren), if
any, to lose coverage under the plan if the original qualifying event had not occurred. Note that to receive this
extension, you and/or your spouse and dependent child(ren), must notify the CHRISTUS Health Plan Administrator
within 60 days of the occurrence of these events.



## 2. Medicare entitlement of employee

If you became entitled to Medicare BEFORE your qualifying event, COBRA laws allow you to remain eligible for up to 18 months of COBRA coverage. However, your spouse and dependent child(ren), if any, may receive extended COBRA coverage for up to the greater of either: (a) 36 months from the date of your Medicare entitlement; or (b) 18 months from the date of your qualifying event, or loss of coverage, whichever is later.

If you become entitled to Medicare AFTER your qualifying event but within the original maximum continuation period of your qualifying event, your spouse and dependent child(ren), if any, may receive an additional 18 months of COBRA coverage. Note that a person generally has become entitled to Medicare when he or she has applied for Social Security income payments or has filed an application for benefits under Part A or Part B of Medicare.

## 3. Disability determination

If it is determined that you and/or your spouse or dependent child(ren), if any, were determined to be disabled (by the Social Security Administration) during the first 60 days of COBRA coverage and you are still disabled at the end of your original maximum continuation period of coverage, the original maximum continuation period may be extended for an additional 11 months for all individuals covered under COBRA coverage from the date of the qualifying event. This extension only applies if the CHRISTUS Health Plan Administrator is notified within 60 days of a disability determination and before the end of the original maximum continuation period. Federal law requires that you notify the CHRISTUS Health Plan Administrator of a determination by the Social Security Administration that you, your spouse, or dependent child(ren) are no longer disabled within 30 days of such a determination. CHRISTUS Health can be reached at (866) 515-1333 during business hours.

## 4. Bankruptcy filing

If the employer files for bankruptcy reorganization and retiree health coverage is lost within one year before or after the bankruptcy filing, COBRA coverage could continue until the death of a retiree (or a surviving spouse of a deceased retiree) or for 36 months from the retiree's death (after the bankruptcy filing) in the case of the spouse and dependent child(ren).

## Newborns and Adoptees

A child who is born to or placed for adoption with you during a period of COBRA coverage will be eligible to become covered under the plan. In accordance with the terms of the CHRISTUS Health group health benefits plan and the requirements of Federal law, these qualified beneficiaries can be added to COBRA coverage upon proper notification to the CHRISTUS Health Plan Administrator of the birth or adoption.

## Early Termination of COBRA Coverage

COBRA coverage may terminate early if:
(1) The required premium payment is not paid when due.
(2) After the date of your COBRA election, you and your spouse or dependent child(ren), if any, become covered under another group health plan.
(3) After the date of your COBRA election, you, your spouse or dependent child(ren), if any, become entitled to Medicare benefits.
(4) All of CHRISTUS Health group health plans are terminated.
(5) If coverage is extended an additional 11 months due to disability, a determination that the individual is no longer disabled.
(6) COBRA coverage may also be terminated for any reason the plan would terminate coverage of a participant or beneficiary not receiving COBRA coverage (such as fraud).

Continuation coverage under COBRA is provided subject to your eligibility. The CHRISTUS Health Plan Administrator reserves the right to terminate your COBRA coverage retroactively if you are determined to be ineligible for coverage. To be sure that you, your spouse and your dependent child(ren), if any, receive the necessary information concerning your rights, you should keep BusinessPlans, Inc. - myCobraPlan informed of any address changes.

If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during a Marketplace open enrollment period. You can also end your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period." If you terminate COBRA continuation early without another qualifying event, you'll have to wait to enroll in Marketplace coverage until the next open enrollment period and may be without health coverage in the interim. When you've exhausted COBRA continuation and the coverage expires, you'll be eligible to enroll in Marketplace coverage through a special enrollment period even if the Marketplace open enrollment has ended. If you sign up for Marketplace coverage instead of COBRA, you cannot switch to COBRA continuation coverage.



Please be advised of your right to obtain a copy of the Summary Plan Description (SPD) for your group health plan by contacting the CHRISTUS Health Human Resource Department at (866) 515-1333. The SPD contains a complete description of your benefits.

This notice is a summary of your COBRA rights. For answers to specific questions, please contact our Customer Service Department at (937) 865-8640 during business hours.

Sincerely,

BusinessPlans, Inc. - myCobraPlan

**CHRISTUS 000234**   Page 3 of 7

# Exhibit A.20

Today 8:15 AM



 Merry Christmas to you and all!   God's love and peace to each.  Be careful - Mark opened the door yesterday without looking first --rough looking guy taking a peek, casing it out.

Text Message | Send

CHRISTUS 000026

# Exhibit A.21

**From:**               Chapa, Erica <erica.chapa@christushealth.org>
**Sent:**                Wednesday, December 21, 2016 4:54 PM
**To:**                  Carvajal, LaRae; Laughlin, Ivonne; !_SPN.HR_BusinessPartners
**Cc:**                  Saucedo, Lilliana; Crunk, Glynda
**Subject:**           RE: Spohn- BG
**Attachments:**     BG pic.docx

-----Original Message-----
From: Carvajal, LaRae
Sent: Wednesday, December 21, 2016 4:39 PM
To: Garcia, Ivonne; I_SPN.HR_BusinessPartners
Cc: Chapa, Erica; Saucedo, Lilliana; Crunk, Glynda
Subject: RE: Spohn- BG

Do you happen to have a picture of him?

LaRae Carvajal
CHRISTUS Spohn Health System
Office:  (361) 881-3846
Fax:  (361) 882-1928
larae.carvajal@christushealth.org

-----Original Message-----
From: Garcia, Ivonne
Sent: Wednesday, December 21, 2016 4:36 PM
To: I_SPN.HR_BusinessPartners
Cc: Chapa, Erica; Saucedo, Lilliana; Crunk, Glynda
Subject: RE: Spohn- BG

All,

I wanted to make you aware of an incident that is occurring at this time.

A Health Informatics Associate (reported to System office) that was recently termed has been seen outside in the Spohn
Shoreline parking area. Security has been contacted.  The associate's name is Billy Green.
He sent a questionable  text message to his former manager, Erica Chapa, this morning.  I briefly consulted Legal.  If this
behavior persists he will be receiving a No Trespass letter.

Feel free to contact me with questions.

Thanks,

**CHRISTUS 000057**

Ivonne Garcia, SPHR
Human Resources Business Partner
Human Resources Strategy
CHRISTUS Health
919 Hidden Ridge | Irving | TX  75039
(o) 469.282.2059
www.christushealth.org

-----Original Message-----
From: Saucedo, Lilliana
Sent: Wednesday, December 21, 2016 4:30 PM
To: Garcia, Ivonne <ivonne.garcia@christushealth.org>
Cc: Chapa, Erica <erica.chapa@christushealth.org>
Subject: Spohn- BG

Hello Ivonne,

I just received a text from Erica Chapa, stating that Billy Green is outside in the Spohn Shoreline parking lot. Erica can see him from her window. She has contacted Security.

Lilliana Saucedo

Sent from my iPhone

CHRISTUS 000058

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

```
BILLY T. GREEN,             )
        PLAINTIFF,          )
                            )
VS.                         ) CIVIL ACTION NO.
                            ) 2:18-CV-0064
CHRISTUS SPOHN HEALTH       )
SYSTEM CORPORATION d/b/a    )
CHRISTUS SPOHN HOSPITAL     )
CORPUS CHRISTI SHORELINE,   )
        DEFENDANT.          )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

LILLIANA SAUCEDO

NOVEMBER 14, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of LILLIANA SAUCEDO, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 14th day of November, 2018, from 9:58 a.m. to 11:04 a.m., before Sharon L. McDonald, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of Akerman, LLP, 112 E. Pecan, Suite 2750, San Antonio, Texas, pursuant to the Federal Rules of Civil Procedure.

f0493d60-fcd7-11e8-887b-0800460222f0

1     Q   Did Ms. Chapa ever discuss Billy Green with you?

2     A   Yes.

3     Q   Do you remember when she first brought up Billy

4  Green with you?

5     A   I'm a little unclear on your question.  When she

6  brought up Billy to me?

7     Q   Yes, ma'am.

8     A   Maybe from the beginning when we had to give

9  updates regarding any initiatives that were pharmacy

10  related.

11     Q   Well, my understanding is he was terminated in

12  December of 2016; is that correct?

13     A   That's correct.

14     Q   Did she bring him up about that time or was it

15  before?

16     A   Before.

17     Q   Was it months before, or a year before, two

18  years before?

19     A   Months before.

20     Q   Do you remember what -- what it was that she

21  brought up that was months before?

22     A   Yes.  In June of 2016, there was an incident

23  where Billy -- Mr. Green had sent communication to the

24  pharmacy directors and leadership to include our health

25  informatics leaders regarding -- it was -- it was -- I

f0493d60-fcd7-11e8-887b-0800460222f0

1    don't remember exactly what the details were, but it was

2    an email that was sent out to them.  And the email was

3    unprofessional.  We did receive communication, myself and

4    Erica, included from Leslie Stewart, the health

5    informatics director of the system, indicating that she

6    did have some concerns with that communication and for us

7    to follow up with Billy Green.  So Erica did provide

8    undocumented, informal coaching to Billy Green in June of

9    2016.

10            Then in July of 2016, there were two

11   incidents as well that occurred.  One incident was where

12   he had sent communication, unprofessional communication

13   to the system CMIO LinkedIn.  I received notification of

14   that verbally from the system CMIO where he had indicated

15   to him how to do his job, recommending what changes

16   should occur in the system; however, that had never been

17   communicated to Erica or I prior to that communication to

18   the system CMIO.

19       Q     The system CFI?

20       A     CMIO, chief medical informatics officer.

21       Q     And who was -- is there a name to that position?

22       A     Dr. Luke Webster.

23       Q     Was Dr. Webster upset about it?

24       A     Yes.

25       Q     Did he tell you he was upset?

f0493d60-fcd7-11e8-887b-0800460222f0

```
 1        A    He told my former director that he was upset
 2   about it.
 3        Q    Who was your former director?
 4        A    Glynda Crunk.
 5        Q    And then Glynda Crunk communicated that to you,
 6   that Dr. Webster was upset?
 7        A    Correct.
 8        Q    Did she use those words, "upset"?
 9        A    Yes.
10        Q    And the concern for yourself and, I guess,
11   Ms. Chapa was that he did not -- Billy Green's failure,
12   was it in what he said, or not saying it to you and
13   Ms. Chapa first?
14        A    Both.  In what was said, and that he had not
15   mentioned it to both Erica and I, Mrs. Chapa.
16             In addition to that, just -- as you had
17   asked earlier if there was anything else that Erica had
18   communicated to me about Billy.  Related to that, Erica
19   was going to follow up with Billy Green about that
20   particular situation.  And it was going to be an
21   associate -- a corrective action form, a verbal, to go
22   over email etiquette, the Christus core values,
23   particularly integrity.  When she tried reaching out to
24   Billy Green -- and I don't remember the specific date on
25   that -- he was not in the office.  I do recall that she
```

f0493d60-fcd7-11e8-887b-0800460222f0

1  November, do you remember him explaining that he was

2  under a lot of stress because of his son?

3      A    No.

4      Q    You never knew that at the time?

5      A    No.

6      Q    Ms. Chapa never told you?

7      A    No.

8      Q    And you never were present for a meeting where

9  Billy would explain that he's having to spend -- like

10  stay up all night, do all kinds of things trying to help

11  his son work through some kind of issues?

12      A    No.

13      Q    Is it news to -- me telling you this now?

14      A    No.

15      Q    So you've learned it since?

16      A    Uh-huh.  Well, I learned it and I saw it as well

17  when I saw the email where he indicated that.  So that's

18  why in December, the beginning -- I guess around

19  December, beginning of December, I went to Corpus Christi

20  and met with him and Ms. Chapa.  And I know this had

21  already been given to him previously -- provided the

22  employment assistance program pamphlet and indicated to

23  him that there were resources available that Christus

24  provides to associates and their families.

25              In addition to that, we provided -- I

```
 1    provided information on -- a reminder of FMLA, the Family
 2    Medical Leave Act.
 3        Q    And what did you tell him about the Family
 4    Medical Leave Act?
 5        A    That that is available and that we can
 6    contact -- he can contact Christus Healthy Habits or our
 7    HR business partner in case he does have additional
 8    questions and would like information on that.
 9        Q    And that was a face-to-face meeting with
10    Mr. Green and Ms. Chapa?
11        A    Yes.
12        Q    And did he mention then that he was still having
13    trouble with his son?
14        A    No.
15        Q    He did not mention that?
16        A    Huh-uh.
17        Q    Did you ever find out what kind of trouble he
18    was having with his son?
19        A    Yes.
20        Q    What's your understanding of what trouble he was
21    having with his son in November, December time frame?
22        A    I don't know specifically, but I do know that
23    there were some concerns or issues that were going on.
24        Q    Do you know what the issues or concerns were?
25        A    No.
```

f0493d60-fcd7-11e8-887b-0800460222f0

1  wanted to inform you today that Erica and I met with

2  Billy Green.  You were via Skype; is that right?

3      A    Yes.

4      Q    You were scheduled to meet with Billy Green.  At

5  2:30, he became agitated and did not allow Erica or I the

6  opportunity to provide coaching to discuss the matter for

7  which he was contacted.

8           In what way did he become agitated and not

9  allow you guys to provide coaching?

10     A    So we were supposed to be meeting with him to do

11  coaching for two unauthorized tardies, and also for -- I

12  believe it was on December 14th -- for a project which he

13  had not communicated on and for which he was not present

14  when he was asked for support on site.

15          So the coaching was supposed to be done on

16  the unauthorized tardies.  When we were there -- well, I

17  was there via Skype.  Erica was there on site.  As

18  mentioned, we were supposed to start at 2:30.  I did ask

19  after 2:30 if he was going to be present and he did show

20  up at 2:39.

21          The beginning of that meeting, Erica

22  indicated that we were going to be meeting with him to --

23  to provide some coaching over the unauthorized tardies

24  that had occurred that day and the day prior.  And over

25  the incident with the initiative or lack of communication

f0493d60-fcd7-11e8-887b-0800460222f0

1   with regards to the initiative that needed to go live on

2   the 14th.

3                  He became agitated by saying, This is

4   bullshit.  Indicating no one needs to be telling me where

5   I need to work and when I need to work.

6                  This is me hearing from my end on the call.

7   I proceeded to say, Billy, that is unacceptable.  That is

8   unprofessional.  We do not tolerate that.

9                  Erica then tells me while I'm on the call,

10  Lilli, he's -- he's walking out of the office.  He's

11  yelling in the hallway.

12                 There were associates present in their

13  cubbies, according to Erica.  He was in the hallway when

14  he was -- I couldn't hear on my end of the phone.  So I

15  proceeded to contact our HR business partner.  I don't

16  remember if I did it via Skype, but I did contact her.

17  And I was concerned at that time for Erica's safety and

18  the team's safety because of what I heard from how he

19  reacted in that meeting, not allowing us an opportunity

20  to proceed with the coaching or anything.

21       Q    What was it about what he said that made you

22  think safety was an issue?

23       A    When he said, This is bullshit.  And when he

24  said, I can work whenever I want, wherever I want, in a

25  loud tone, what sounded like an angry, loud tone.

f0493d60-fcd7-11e8-887b-080046022f0

1      A     That was -- no, I don't remember.

2      Q     And then you state that he was unwilling -- you

3   state that he was unwilling to do it.  I guess you're

4   saying he was unwilling to provide this report?

5      A     Yes.

6      Q     You don't recall?

7      A     Huh-uh.

8      Q     And then he voiced that he would report this to

9   the highest levels.  What did he say he would report to

10  the highest levels?

11     A     He only indicated that he would report this to

12  the highest levels, but did not indicate what.

13     Q     Was there a problem with the go -- with the

14  Pixus Go Live on December 14th?

15     A     They only ended up going live with one facility

16  versus six.

17     Q     Was that bad?

18     A     No.

19     Q     No?  Is that something that you and Erica Chapa

20  expected to happen?

21     A     No.  Billy had informed us that six would be

22  going live, but only one went live.

23     Q     So based on what Billy told you, you thought all

24  six would go live?

25     A     Correct.

1          Q     Did Billy express any concerns to you with how
2     the Go Live was set up or put in place?
3          A     No.
4          Q     When he says he'll report this to the highest
5     level, is it possible he was referring to the Pixus Go
6     Live on December 14th?
7                      MS. BLAIR:   Objection, calls for
8     speculation.
9          A     No.
10         Q     (BY MR. CRANE) You're saying it's not possible?
11         A     I don't think so.
12         Q     Well, you don't -- you have no understanding of
13    what he meant when he says he's going to report this to
14    the highest levels?
15         A     I think it might be related to this in general.
16    I don't know.
17         Q     And then the rest of your paragraph at the top
18    of Page 2 says, He's been placed on administrative leave.
19    Badge has been disabled.   His access has been disabled.
20    He has been escorted by security at Spohn Shoreline.
21                      What does it mean when he says he has been
22    escorted by security at Spohn Shoreline?
23         A     So when he did yell, This is bullshit, and when
24    he said, I can work from home whenever I want, wherever I
25    wanted, someone contacted security.   I don't know who.

f0493d60-fcd7-11e8-887b-0800460222f0

1    Maybe one of the associates.  I don't know.  Someone

2    contacted the security guard.  And I wasn't there

3    physically, so I don't know exactly what happened, but I

4    do know that Erica tried talking to him and he still

5    remained very agitated.  So security was called and he

6    was asked for his badge and was escorted out.

7         Q    Escorted --

8         A    Escorted, but I think he did speak -- I'm not

9    sure -- to the HR business partner as well.  I was told

10   that he was being placed on administrative leave.

11        Q    Escorted out of the facility, you mean?

12        A    Yes.

13        Q    So was he being fired?

14        A    He was placed on administrative leave.

15        Q    Which means what?

16        A    That he's placed on administrative leave until

17   Christus -- we have time to evaluate the situation and

18   then make the determination on whether or not he should

19   be fired.

20        Q    And you base that on what Erica Chapa told you?

21        A    No.  On what occurred.

22        Q    Well, how do you know what occurred?

23        A    Well, the way he reacted during our last

24   conversation, which was supposed to be a coaching

25   opportunity.

f0493d60-fcd7-11e8-887b-0800460222f0

## CHANGES AND SIGNATURE

**WITNESS: LILLIANA SAUCEDO**
**DEPOSITION DATE:  November 14, 2018**

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 10 | 1 | "details were" to "wording was" | Clarification |
| 13 | 9 | "I believe so" to "if not pre-approved" | Clarification |
| 14 | 9 | "Live" to "Life" | Transcription Error |
| 23 | 14 | "I don't remember" to "Yes" | Refreshed memory with document |
| 24 | 22 | Add before "From July"; "The PIP was related to the Final corrective action in November" | Misunderstood |
| 29 | 12 | "No" to "Yes, in December" | Misunderstood |
| 30 | 14 | "No" to "Yes" | Misunderstood |
| 41 | 1 | "That was – no, I don't remember" to "Ivonne tried to talk to him on the phone to get his report and he refused." | Misunderstood |
| 41 | 7 | "Huh uh" to "He refused to speak to Ivonne." | Misunderstood |
| 43 | 8-9 | " - I'm not sure – to the HR business partner as well" to "to Erica about what the HR business partner said as well." | Clarification |
|  |  |  |  |

_Lilliana Saucedo_
Lilliana Saucedo

Date: _12-19-18_

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                      CORPUS CHRISTI DIVISION

 3   BILLY T. GREEN,                )
            PLAINTIFF,              )
 4                                  )
     VS.                            )  CIVIL ACTION NO.
 5                                  )  2:18-CV-0064
     CHRISTUS SPOHN HEALTH          )
 6   SYSTEM CORPORATION d/b/a       )
     CHRISTUS SPOHN HOSPITAL        )
 7   CORPUS CHRISTI SHORELINE,      )
            DEFENDANT.              )
 8

 9

10          REPORTER'S CERTIFICATE/FILING CERTIFICATE

11          ORAL DEPOSITION OF LILLIANA SAUCEDO

12                    November 14, 2018

13

14       I, SHARON L. MCDONALD, Certified Shorthand Reporter

15   in and for the State of Texas, do hereby certify that the

16   facts stated by me in the caption hereto are true; that

17   the foregoing deposition transcript of LILLIANA SAUCEDO,

18   the witness, herein before named, was at the time

19   mentioned taken by me in stenograph, the said witness

20   having been by me first duly cautioned and sworn upon her

21   oath to tell the truth, the whole truth and nothing but

22   the truth, and later transcribed from stenograph under my

23   supervision.

24       I further certify that I am neither attorney or

25   counsel for, related to, nor employed by any parties to
```

1   the action in which this testimony was taken and,

2   further, that I am not a relative or employee of any

3   counsel employed by the parties hereto or financially

4   interested in the action.

5       I further certify that pursuant to information given

6   to the deposition officer at the time said testimony was

7   taken, the following includes all parties of record and

8   the amount of time used by each party at the time of the

9   deposition:

10          Mr. Thomas J. Crane (1 hour, 6 minutes)
              Attorney for Plaintiff

11          Ms. Danya W. Blair (0 hours, 0 minutes)
              Attorney for Defendant

12

13      I further certify that $378.00 is the officer's

14  charges to the plaintiff for preparing the original

15  deposition transcript and any copies of exhibits.

16      That the deposition transcript was submitted on

17  December 3, 2018, to the witness or to the attorney for

18  the witness for examination, signature, and return to me

19  by January 3, 2019;

20      I further certify that the above and foregoing

21  deposition transcript as set forth in typewriting is a

22  full, true and correct transcript of the proceedings had

23  at the time of taking said deposition.

24

25

1        Certified to by me this the 3rd day

2   of December, 2018.

3

4

5   _____
                    Sharon L. McDonald, CSR
6                    Texas CSR 5423
                    Expiration:  12/31/19
7                    Hill Country Court Reporters
                    Firm Registration No. 423
8                    6838 Country Hill
                    San Antonio, Texas  78240
9                    (210)691-1633

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                CORPUS CHRISTI DIVISION

 3   BILLY T. GREEN            )
                              )
 4        Plaintiff(s)         )
                              )
 5   VS.                       )  C.A. NO. 2:18-CV-0064
                              )
 6   CHRISTUS SPOHN HEALTH     )
     SYSTEM CORPORATION D/B/A )
 7   CHRISTUS SPOHN HOSPITAL   )
     CORPUS CHRISTI SHORELINE  )
 8                            )
          Defendant(s)         )
 9

10   ********************************************************

11            ORAL AND VIDEOTAPED DEPOSITION OF

12                    BILLY T. GREEN

13                  NOVEMBER 15, 2018

14                      VOLUME 1

15   ********************************************************

16

17        ORAL AND VIDEOTAPED DEPOSITION OF BILLY T. GREEN,

18   produced as a witness at the instance of the Defendants,

19   and duly sworn, was taken in the above-styled and numbered

20   cause on NOVEMBER 15, 2018, from 10:37 a.m. to 5:41 p.m.,

21   before MARCY A. WELLS, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of Lexitas,

23   1450 Wells Fargo Tower, 615 North Upper Broadway, Corpus

24   Christi, Texas, pursuant to the Federal Rules of Civil

25   Procedure.
```

1    that morning from a pharmacist about what the pharmacist

2    termed as an urgent issue that could be a patient safety

3    issue, so I logged in from home to try to address the

4    concern.  Erica interrupted with this Skype conversation,

5    but then I phoned her afterwards.

6         Q    Well, you understood, at that time, that you

7    were not supposed to work from home without permission

8    from your supervisor, correct?

9         A    Yes, I did.  I might add that she and I had

10   discussed the issue about my having to work from home to

11   address urgent issues.  Other department employees who are

12   also single parents were allowed to work from home.  Isla

13   Lara comes to mind.  She often left early and continued

14   her work from home.  She also had a single son that she

15   cared for.  Isla Lara's statement was, "Well, Erica knows

16   that we work from home.  We know that she knows that we

17   work from home, but we just don't discuss it.  If you

18   don't make an issue of it or don't talk about it with her,

19   they won't bring it up and make an issue out of it.

20        Q    Okay.  Well, it appears, from this Skype

21   exchange, that Erica is making an issue of it and

22   reminding you that she needs to be aware of it if you're

23   working from home, right?

24        A    Yes.  That very well illustrates her unfair

25   treatment of me compared to other department employees.

1          Q      So you feel that back in July of 2016, Erica

2    Chapa was treating you unfairly?

3          A      Absolutely.

4          Q      And you believe that -- is it Isla Lara?

5          A      Yes.

6          Q      -- that Isla Lara was not getting permission

7    to work at home?

8          A      She worked from home frequently.  Erica was

9    aware of it and permitted it.

10          Q      Okay.  And Erica, on this occasion, at least

11    on July 14, 2016, was not aware that you were working from

12    home when she tried -- reached out and tried to contact

13    you?  You had not made her aware of it ahead of time?

14          A      No.  I had not because it was an emergency

15    situation where I've been contacted by a pharmacist  for

16    the patient safety issue that I had addressed.

17          Q      So where, in this Skype exchange, when she

18    asks you why you're working from home, do you tell her

19    that you are dealing with an urgent issue that someone

20    called you about?

21          A      We discussed that on the phone call where

22    she -- I might add some background to this issue.  I got

23    that call and felt like it needed to be addressed, but I

24    was supposed to be off work, so I started looking at it

25    from home.  I'd gotten up, had not checked my blood

1    pressure -- I mean my blood sugar, had not taken my

2    insulin.  I found Erica after the Skype exchange.  She

3    started fussing at me, raising her voice.  I felt like I

4    was her six year old son or her hen-pecked husband or

5    something.  She continued, got very rude and obnoxious, at

6    which point I hung up on her.  I told her I would talk to

7    her later.  I couldn't communicate effectively with her,

8    being out of control like that.

9         Q     Okay.  Now, when your supervisor, Erica

10   Chapa, was having a work related discussion with you about

11   performance expectations, you say you felt like a

12   hen-pecked husband?

13        A     This was on the phone call subsequent to

14   this text exchange.

15        Q     Did you ever have --  Did you have a problem

16   being asked to report to a woman?

17        A     No.

18        Q     Did you have problems being asked to report

19   to a Hispanic woman?

20        A     No.

21        Q     Did you ever refer to Erica Chapa and

22   Lilliana Saucedo as Hispanic boss buddies?

23        A     No.

24        Q     Did you have trouble being asked --  Did you

25   have an issue with being asked to report to an RN as

1      opposed to a pharmacist?

2           A      No.  I had issues with Erica's treatment of

3      me.  One statement she made in front of several other of

4      my department coworkers was, "When you first started

5      working here, I thought you were really stupid, but I

6      think you're pretty cool now."

7           Q      Who said that?

8           A      Erica Chapa.

9           Q      So back to my question.  You say that the

10     reason that you were working from home without permission

11     is because it was an emergency situation.  So why is it

12     that when Erica Chapa asked you, at the very beginning of

13     her message, "Why are you at home," instead of saying, "I

14     have an emergency situation that I'm dealing with for

15     work," you said, "I got stuck at work, LOL, was talking

16     with Randy yesterday"?  What does that have to do with the

17     reason that you were working at home, if it was an

18     emergency situation?

19          A      She was concerned that I was working too

20     many hours.  Christus had -- did not want people working

21     outside of their normal work hours; yet, my workload was

22     such that it required me to work extra hours, which was

23     the reason I needed access to be able to work from home,

24     to be able to complete my assignments.

25               MS. BLAIR:  Objection.  Nonresponsive.

1    E-mailing me," or whoever, you know.  That's not her

2    point.  Erica is the person that's making a big deal out

3    of me communicating directly with my supervisors in

4    Irving, and she felt like it made her look bad if she

5    didn't come up with a resolution to these issues to

6    present to her superiors.  I mean, I didn't give a rip

7    whether people got angry at me or not about communicating

8    via E-mail, trying to resolve important issues that could

9    impact patient safety.  My only concern was that the

10   issues be resolved in a timely fashion and that we avoid

11   any potential patient safety issues.

12             MS. BLAIR: I'll object to nonresponsive.

13       Q     So is it your -- Is it your claim that

14   Erica Chapa's discipline, the discipline you received from

15   Erica Chapa in June and July of 2016 was motivated by

16   something other than your insubordination and job related

17   misconduct?

18       A     Absolutely.

19       Q     Okay.  And what are you claiming that it

20   was motivated by?

21       A     I have no idea what her actual motivation

22   was.  I would assume that she was concerned that if Leslie

23   and Marvin and the folks in Irving found out that we were

24   having issues that she had not been able to resolve, that

25   it would reflect poorly upon her.

```
 1          Q      Anything else that you think motivated her

 2    discipline of you in June or July of 2016?

 3          A      Just the way she treated me.

 4          Q      I mean, do you think she just didn't like

 5    you?

 6          A      A statement like "I thought you were stupid"

 7    in front of other department members seems to indicate

 8    that she did not like me.

 9          Q      Did you like her?

10          A      I did.  I baked her a red velvet cake for

11    her birthday.  I tried to be as open and communicative

12    with her as possible.

13          Q      All right.  Do you think there's anything

14    else that was motivating Erica Chapa's discipline issue to

15    you in June or July of 2016, other than what we've already

16    discussed?

17          A      I don't know.  I can't speak for her

18    motivations.

19          Q      All right.  And we talked about the fact

20    that you did not write any associate comments here on the

21    discipline form in July -- on July 14th of 2016, and you

22    say because you didn't think it would do any good to do

23    that, right?

24          A      My issues with regard to getting

25    infrastructure problems addressed, as well as other
```

1       Q      Is he a general practitioner or what type of

2    doctor?

3       A      Yes.

4       Q      Okay.  And so you're saying this was in

5    November of 2016?

6       A      Right.  That's when I had taken the form to

7    him.

8       Q      All right.  And so you filled out the

9    form -- you had Dr. Lopez fill out the medical provider

10   form and who did you give it to?

11      A      I submitted it to Liberty Mutual.

12      Q      All right.  And what happened?  Let me ask

13   you this:  What dates did you request to take FMLA leave?

14   What were the dates in your FMLA request?

15      A      Erica and I were trying to figure out how to

16   get by without my having to take FMLA leave.  That was

17   both of our goal.  I didn't want to have to miss work, but

18   the issues with Mark had gotten so bad, I didn't actually

19   follow through with the next steps in taking FMLA.  Of

20   course, I would have needed to have gotten documentation

21   from his physician if I was taking FMLA on his behalf.

22   So, at one point, I believe at the meeting -- it's

23   documented with -- It was one of those exhibits that you

24   produced after the first exhibits were presented during

25   the quarterly appraisal review.  We had talked about that,

```
 1   and I was saying, "I think I need to take FMLA.  Mark is

 2   keeping me up all night.  She mentioned that in that

 3   performance review but didn't give any details, of course,

 4   due to patient privacy concerns; and, at one point, I met

 5   with her about that, and she just said, "Don't worry about

 6   it.  I'll fix it."  I didn't have enough PTO time to take

 7   the mandatory holidays for Christmas and New Year's.

 8        Q     But you'd been communicating with Liberty

 9   Mutual about your FMLA, right?

10        A     Right.

11        Q     And you understood that you don't have to

12   have any accrued paid time off to take FMLA leave, right?

13        A     Well, my thought -- I mean, Erica and I both

14   were trying to avoid the need for me to take FMLA leave

15   because we had the three big projects.  We had the

16   MEDITECH upgrade.  We had the I.V. pump purchase, which I

17   was the only person at Christus Spohn who had the ability

18   to program those pumps and the only person with access to

19   get in there and fix the data sets for the pump purchase.

20   So I was concerned that if I was missing work, that the

21   pump purchase would fall through because we wouldn't get

22   those pumps -- the new pumps programmed when they are

23   delivered and brought on line.

24        Q     So are you saying Erica was also concerned

25   about you being gone, because she didn't think that she
```

1        Q       Right here (indicating)?  All right.

2        A       Bear in mind, this is at the time that my

3    son had been in the hospital in San Antonio.

4        Q       Okay.  And you had asked to work out of San

5    Antonio while your son was in the hospital, and you were

6    granted that request, right?

7        A       No.  Actually, Erica charged me for PTO time

8    when she told me I could work from up there.

9        Q       Okay.  She set up an office for you to work

10   out of San Antonio and you never showed up; is that right?

11       A       My son was discharged on the day that I

12   arrived up there.

13       Q       Are you saying that she denied your request

14   to be allowed to work from San Antonio while your son was

15   in the hospital, out of Santa Rosa?

16       A       She didn't deny my request.  She billed me

17   for PTO time.

18       Q       Is that because you never showed up to work

19   at Santa Rosa?

20       A       No.  I phoned her and said, "Mark has been

21   discharged," you know.  So there was no need for me to go

22   work out of Santa Rosa because I had to take him back to

23   Corpus.

24       Q       And so you took a PTO day to do that?

25       A       Well, she charged me for a PTO day.  She

```
 1    said she wasn't going to do that, which is not really --

 2    Well, it is pertinent because I'd run out of PTO time,

 3    which was going -- so I have to take -- but I take FMLA

 4    leave.  That was the only way I could preserve my job and

 5    care for my son at the same time; yet, once they met with

 6    me to discuss that, Erica tried to dissuade me from taking

 7    it by saying, "Don't worry about it.  I'll just fix it,"

 8    and then, three days later, they turn around and

 9    terminated me.

10         Q     So are you saying that you --

11         A     I'm saying exactly what I said.  Don't read

12    anything into it.

13         Q     That you were charged for a PTO day on a day

14    that you were actually working out of Santa Rosa?

15         A     We discussed the details of my having to go

16    to San Antonio to get my son.  Erica was aware that no one

17    knew what day he would be discharged.  I had talked with

18    John Jacobs, who was, at the time, Erica's equivalent in

19    San Antonio, and he said, "Sure, I've got an office up

20    here for you to use," and she said, "Yeah, that will be

21    fine.  You can work out of San Antonio while he's in the

22    hospital.  Went up there and spent the night; got up the

23    next morning and they phoned me about 8:30 or so and said,

24    "We think Mark will be discharged today."  So she charged

25    me for a PTO day for that day.
```

```
 1          Q     Did you work that day?

 2          A     No.  I'm just telling you what happened.

 3          Q     All right.  I'm going to hand you, Mr.

 4   Green, an exhibit that's been marked as Exhibit 12 to your

 5   deposition.

 6                         (EXHIBIT NO. 12 WAS MARKED

 7                         FOR IDENTIFICATION.)

 8          Q     And this is the Performance Improvement Plan

 9   referenced in the previous document.  Take a look at that

10   document and then I'm going to ask you some questions

11   about it.

12          A     Did you ask me a question about this

13   document?

14          Q     No.  I was giving you a chance to look at it

15   first.

16          A     Oh.  Okay.

17          Q     Have you had an opportunity?

18          A     Certainly.

19          Q     All right.  If you look at the last page of

20   that document, is that your signature?

21          A     Yes, it is.

22          Q     And you wrote a date of December 7th, 2016,

23   next to your signature?

24          A     Yes.

25          Q     And did you, in fact, review this
```

1          Q        (By Ms. Blair)    And, also, I'm not talking

2     about September right now.    I only want to talk about

3     these three from December, okay?

4          A        This is the September one.    Okay.    I was

5     correct.    I didn't get three --

6          Q        You can't actually write on those.    Those

7     are the court reporter's exhibits.

8          A        Oh, okay.

9          Q        Those are actually --    I'm giving them to

10    you, but I'm only giving them to you --

11                    MR. CRANE:    They actually belong to the

12    court reporter.

13         A        I thought they were my copies.

14         Q        Once they're marked, they belong to her.    So

15    that's fine.    We will just note on the record that there's

16    a little bit of a scribble on Exhibit 8 that was made by

17    Mr. Green.

18                    All right.    So looking at Christus 68, do

19    you see there that Ms. Chapa is expressing a concern about

20    reports that were made to her that you were not onsite,

21    not available during the Pyxis Go Live on December 14th?

22         A        Yes.    I have that document here.

23         Q        Okay.    And that is a coaching document,

24    right?  It's not a corrective action form.    It's a

25    coaching document, right?

1          A     Yes.

2          Q     And you had been presented with coaching

3    documents by Ms. Chapa before?

4          A     Yes.

5          Q     As we saw in September, right?

6          A     Yes.

7          Q     And you understood that the purpose of the

8    coaching document was for her to set out what the concerns

9    were and what the expectations were to help you improve,

10   right?

11         A     Right.

12         Q     Okay.

13         A     Understand that this write-up regarding the

14   Pyxis Go Live was Erica's concern to not look bad for her

15   supervisors in Irving due to the fact that I put my foot

16   down and refused to initiate changes at six emergency room

17   slides at once due to the fact that nursing had not been

18   trained on the new user interface.  It would have delayed

19   administration of emergent drugs where nurses are not able

20   to pull drugs from the Pyxis drug dispensing cabinets.  I

21   told her that, but she wanted to try to do it anyway, not

22   to mention it was physically impossible for me to be at

23   six sites at one time to ever see the transition.

24         Q     Were you at one site?

25         A     Yes.  At Spohn-South.

1    couldn't do that.

2         Q     So if she says that --

3         A     Linda was also --  Excuse me.  Linda was

4    also concerned that the nurses had not been trained at all

5    sites and that flipping all sites at once would -- could

6    be disastrous.

7         Q     So you decided, contrary to what Erica

8    wanted --

9         A     Absolutely.  I made that decision.

10        Q     So you decided, contrary to what Erica, your

11   supervisor, wanted to do, you were only going to go live

12   at one site?

13        A     Yes.

14        Q     And you feel she was upset about that

15   because it made her look bad?

16        A     And retaliated by writing me up three times

17   and terminating me after I'd applied for FMLA leave.

18        Q     Because you --

19        A     I mean, I have no way to know what her

20   motivation was to continue harassing me about things, but

21   I will not jeopardize patient safety.  I don't care if the

22   president of the company says to do something.  If I feel

23   like it's something that's going to cause a patient safety

24   issue, I'm not going to do it.

25        Q     But you feel like --  You say you don't know

1    why Erica got angry and terminated you, but you do know

2    that you and she had a serious professional disagreement

3    about this Go Live?

4           A      That, we did.

5           Q      And you do --  It is your position and your

6    testimony under oath that rather than just go live at one

7    facility instead of six, like you wanted to do, you

8    actually told her you were going to do that in advance?

9           A      She was aware of that and Linda was aware of

10   that, and Linda agreed with me that we should only do

11   South first.  For one reason --

12          Q      But I'm not asking about Linda.  I'm

13   asking --

14          A      And I'm telling you what happened.

15          Q      Right.

16          A      The Pyxis coordinator for Spohn-South had

17   completed her portion of what had to be done to convert

18   those Pyxis machines to the profile setting.  The other

19   sites weren't ready yes.  That, in addition to the fact

20   that nursing hadn't been trained, so I just felt that we

21   couldn't go forward with it.

22          Q      Okay.  And so setting aside what Linda knew

23   and what you think Erica Chapa knew, did you personally

24   tell Erica Chapa, prior to December 14, 2016, here under

25   oath, I'm asking you, did you tell her that you were going

```
 1                    (EXHIBIT NO. 15 WAS MARKED

 2                    FOR IDENTIFICATION.)

 3          Q     It's called receiving through the U.S.

 4    Postal Service on Christmas Eve, December 24th, 2016, your

 5    personal belongings being returned to you by Christus?

 6          A     I thought that was highly unusual,

 7    considering that they had told me I was on administrative

 8    leave.

 9          Q     All right.  So the answer to my question is:

10    Yes, you did receive your personal belongings from

11    Christus on Christmas Eve 2016?

12          A     Repeat the question.

13          Q     You do recall receiving your personal

14    belongings returned to you by Christus through the U.S.

15    mail, receiving those on December 24th, 2016?

16          A     I did, and when I opened the package, Erica,

17    who evidently packed the package, because she signed for

18    the package on the certified mail receipt, had broken the

19    photograph, eight by ten photograph of my son, Little

20    League photo.  Several other items were broken and just --

21    I didn't know what to think.  I thought, "Why is she

22    sending me my stuff broken?"

23          Q     So it was broken by the time it got to you?

24          A     Maybe in shipping.  It sure didn't appear

25    that way from the way the box was packed.  It was broken
```

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION

 3   BILLY T. GREEN              )
                                 )
 4        Plaintiff(s)           )
                                 )
 5   VS.                         )  C.A. NO. 2:18-CV-0064
                                 )
 6   CHRISTUS SPOHN HEALTH       )
     SYSTEM CORPORATION D/B/A    )
 7   CHRISTUS SPOHN HOSPITAL     )
     CORPUS CHRISTI SHORELINE    )
 8                               )
           Defendant(s)          )
 9

10              REPORTER'S CERTIFICATION

11        ORAL AND VIDEOTAPED DEPOSITION OF

12                  BILLY T. GREEN

13               NOVEMBER 15, 2018

14                    VOLUME 1

15

16      I, MARCY A. WELLS, Certified Shorthand Reporter in

17   and for the State of Texas, hereby certify to the

18   following:

19      That the witness, BILLY T. GREEN, was duly sworn by

20   the officer and that the transcript of the oral deposition

21   is a true record of the testimony given by the witness.

22      I further certify that pursuant to FRCP Rule 30(f)(1)

23   that the signature of the deponent;

24      _x__ was requested by the deponent or a party before

25   the completion of the deposition and returned within 30
```

1   days from date of receipt of the transcript.  If returned,

2   the attached Changes and Signature Page contains any

3   changes and the reasons therefore;

4        ___ was not requested by the deponent or a party

5   before the completion of the deposition.

6        I further certify that I am neither attorney nor

7   counsel for, related to, nor employed by any of the

8   parties to the action in which this testimony was taken.

9        Further, I am not a relative or employee of any

10  attorney of record in this cause, nor do I have a

11  financial interest in the action.

12

13

14       Subscribed and sworn to on this 12th day of

     December, 2018.

15

16

17

18       MARCY A. WELLS, Texas CSR 2777
         Expiration Date: 12-31-19
19       DepoTexas
         Firm Registration:  644
20       615 N. Upper Broadway, Suite 1450
         Corpus Christi, Texas
21       361-883-3400

22

23

24

25

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION

 3    BILLY T. GREEN                  )
                                      )
 4         Plaintiff                  )
                                      )
 5    VS.                             )   CIVIL ACTION
                                      )   NO.: 2:18-CV-0064
 6                                    )
      CHRISTUS SPOHN HEALTH SYSTEM    )
 7    CORPORATION, D/B/A CHRISTUS     )
      SPOHN HOSPITAL CORPUS           )
 8    CHRISTI SHORELINE               )
                                      )
 9                                    )
           Defendants                 )
10

11              ------------------------------------

12               ORAL AND VIDEOTAPED DEPOSITION OF

13                       BILLY T. GREEN

14                      NOVEMBER 16, 2018

15                          Volume 2

16              ------------------------------------

17         ORAL AND VIDEOTAPED DEPOSITION OF BILLY T. GREEN, produced

18    as a witness at the instance of the Defendant, and duly sworn,

19    was taken in the above-styled and numbered cause on the 16th

20    day of November, 2018, from 8:33 a.m. to 11:21 a.m., before

21    SKYLAR RODRIGUEZ, CSR in and for the State of Texas, reported

22    by machine shorthand, at the offices of Lexitas, 615 N. Upper

23    Broadway, Suite 1450, Corpus Christi, Texas 78401, pursuant to

24    the Federal Rules of Civil Procedure.

25
```

1    you actually produced to us in response to our request for

2    communications with Christus employees.   Could you thumb

3    through that and let me know if that is, in fact, what this

4    appears to be?

5                    (Exhibit No. 18 was marked.)

6         A.    This is what we had produced.

7         Q.    (By Ms. Blair) As communications with Christus

8    employees?

9         A.    Yes.

10        Q.    Are there any other communications that you still

11   have or still have access to, other than the ones that you took

12   out and read to me yesterday on your phone and these that you

13   produced, that would be with Christus employees since your

14   termination?

15        A.    Not that I'm aware of.

16        Q.    Okay.   And another document that you produced, which

17   I've marked as Exhibit 19, is labeled at the top as a text

18   message to Marvin Skinner, Enterprise Pharmacy Informatics

19   Director in Irving, Texas.   Is this a document that you've seen

20   before?

21                    (Exhibit No. 19 was marked.)

22        A.    Yes.

23        Q.    (By Ms. Blair) All right.   And where did this come

24   from?

25        A.    It looks like somebody copied what was a Facebook

1   Messenger message.

2       Q.   Was that you that copied it?

3       A.   Yes.

4       Q.   All right.  And how did you -- how did you do that,

5   just cut and paste it or how did you copy this for production?

6       A.   It may have been a text message, but it's just copied

7   and pasted onto a word document and printed out.

8       Q.   Okay.  Because I didn't see a date on here.  Do you

9   know the date of this text?

10      A.   It was early in 2017, probably January or so, 2017.

11  I can't say for certain.

12      Q.   Do you still have this text on your phone, or is it a

13  Facebook message?

14      A.   I don't know.  I can look.  Let's see.

15      Q.   Okay.

16      A.   I don't see it here.

17      Q.   All right.  So do you know if you received any

18  response to this from Mr. Skinner?

19      A.   I don't think I did.

20      Q.   All right.

21      A.   I know there was another text message to him where I

22  detailed some of the things that I had been working on that

23  they needed to follow up on, but I don't have access to that.

24      Q.   Why not?

25      A.   It doesn't go back that far.  I remember I looked for

 1    that message when I found this one.

 2         Q.    Okay.  Can you -- I want to go through this with you

 3    and ask you about what some of this means.  Could you read the

 4    first sentence for me?

 5         A.    "Hey, by the way, what's up with this sneaky nurse

 6    takeover, with two or three of them trying to put one over on

 7    their old antique pharmacist?"

 8         Q.    Okay.  So what did you mean by -- in this message

 9    that you sent to Marvin Skinner in early 2017, what did you

10    mean by the "sneaky nurse take over"?

11         A.    I was referring to the Pyxis project where they

12    attempted to follow through with Marvin's directions to flip

13    all the BD Pyxis machines to profile setting that I objected

14    to.

15         Q.    That's what you're referring to here?

16         A.    Yes.

17         Q.    And what led you to text or message Mr. Skinner about

18    this sneaky nurse takeover in early 2017 when you were no

19    longer working over at Christus?

20         A.    This was before March.  So I had not determined what

21    my employment status was at that point in time.

22         Q.    But your last day of work had been December 16th --

23         A.    Right.

24         Q.    -- of 2016?

25         A.    Right.

1    after December 16th, so probably -- I think they sent them on

2    Thursday, so probably the following Thursday.

3        Q.   Okay.  So you stopped getting a paycheck shortly

4    after December 16th, 2016.  Right?

5        A.   Right.

6        Q.   Wasn't that one more indication to you, in addition

7    to all of the indications that we discussed yesterday, that you

8    were no longer working there?

9        A.   No.  If I were on FMLA leave, I would have not been

10   paid for that.  That's leave time without pay.

11       Q.   All right.  And then the next sentence here says,

12   "She and her also female Hispanic boss buddy do their retarded

13   write-ups.  And she says, "Thank you, you just don't know how

14   much we appreciate it."

15              What did you mean by that?  First of all, who is

16   "she and her also female Hispanic boss buddy"?  Who are you

17   referring to?

18       A.   Referring to Lilliana Saucedo and Erica Chapa.

19       Q.   Okay.  And what do you mean by "they do their

20   retarded write-ups.  And she says, "Thank you.  You just don't

21   know how much we appreciate it."

22       A.   She's just very sarcastic in her demeanor and sort of

23   treated me like, well, we're us.  You're not us.  We appreciate

24   it.  She's just very snide and rude about that sort of that.

25       Q.   And you don't appreciate sarcasm in business

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION

 3    BILLY T. GREEN                 )
                                     )
 4        Plaintiff                  )
                                     )
 5                                   )
      VS.                            )   CIVIL ACTION
 6                                   )   NO.: 2:18-CV-0064
                                     )
 7    CHRISTUS SPOHN HEALTH SYSTEM   )
      CORPORATION, D/B/A CHRISTUS    )
 8    SPOHN HOSPITAL CORPUS          )
      CHRISTI SHORELINE             )
 9                                   )
          Defendants                 )
10

11                  REPORTER'S CERTIFICATION

12              DEPOSITION OF BILLY T. GREEN

13                   NOVEMBER 16, 2018

14

15        I, SKYLAR RODRIGUEZ, Certified Shorthand Reporter in and

16    for the State of Texas, hereby certify to the following:

17        That the witness, BILLY T. GREEN, was duly sworn by the

18    officer and that the transcript of the oral deposition is a

19    true record of the testimony given by the witness;

20        I further certify that the pursuant to FRCP rule 30(f)(1)

21    that the signature of the deponent:

22        __X__ was requested by the deponent or the party

23    before the completion of the deposition and returned within 30

24    days from date of receipt of the transcript.  If returned, the

25    attached Changes and Signature Page contains any changes and
```

1    the reasons therefore; _____ was not requested by

2    the deponent or a party before the completion of the

3    deposition.

4         I further certify that I am neither an attorney nor

5    counsel for, related to, nor employed by any of the parties to

6    the action in which this testimony was taken.

7         Further I am not a relative or employee of any attorney of

8    record in this cause, nor do I have a financial interest in the

9    action.

10        Subscribed and sworn to on this the 5th day of

11   December, 2018.

12

13

14

15   _____
     SKYLAR MEAGAN RODRIGUEZ
     Certified Shorthand Reporter
16   Certification No. 9205
     Expiration Date: 12/31/2020
17   LEXITAS-Firm Registration No. 644
     Wells Fargo Tower, Suite 1450
18   615 N. Upper Broadway
     Corpus Christi, Texas 78401
19   Phone:  (361) 883-3400

20

21

22

23

24

25

# Exhibit E



# Luke Webster, M.D. · 1st

## Luke Webster, M.D. ✕

Hello Dr. Webster!  I see Christus has now opened 3 new Promptu medical clinics in Corpus Christi.  I wanted to make a suggestion.  It may be wise to consider using sites we already own or lease for Promptu clinics.  The Christus clinic building on Padre Island is a good example.  I know those new sites are in "high rent" commercial locations.  Using our existing infrastructure for Promptu sites could reward us for our good stewardship of resources.  Thanks,  Billy

BG000216

# Exhibit F

Text message to Marvin Skinner, Enterprise Pharmacy Informatics Director in Irving, Texas:

Hey- by the way - what's up with this sneaky nurse takeover, w 2 or 3 of them trying to put one over on their old antique pharmacist?  Especially since I told her that I'd tell her where they screwed up...once, or if, she fixed the screw up.  Oh, well. Intentionally refusing to even get me a blasted functional headset was chicken scratch compared to her refusal to acknowledge, much less grant simple accommodation requests...especially considering I'd burned 8 pto days w/ my son hospitalized in San Antonio....and then she'd first said "do FMLA," then "don't worry about it.  We'll pay your 1 PTO day, then just not pay for the days you need off for Christmas." Oh, and the fact that I'm missing 3 paychecks, PLUS my - & my son's - insurance was turned off—BEFORE the supposed termination took effect.  And yet, premiums were still collected.... I just LOVE it.  She and her also female Hispanic boss buddy do their retarded write ups, & she says:  "Thank you! You just don't know how much WE appreciate it." Well, she DID actually try to have me arrested when I went back up to talk to her.  So it's not as if she doesn't care.      I did call it around and recommend her for her position, though. THAT was brilliant.  No. Actually she has great potential - just overloaded like all of us.  Anyway, my son's all better now!  Not bipolar disorder-just some weird neuro stuff from the guy who plowed into him in that wreck 9/11.  And SMH did NO neuro/head injury exam, MRI/CT etc.   I had to sue Allstate for not paying the wreck claim...plus, that caused job loss (?)   Not quite sure how to proceed....I'm sure I won't do nothing, though.

BG000028