United States District Court
Southern District of Texas
**ENTERED**
June 13, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BILLY T. GREEN, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-64 |
| | § | |
| CHRISTUS SPOHN HEALTH SYSTEM, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Billy Green brings this suit against his former employer, Defendant Christus Spohn Health System Corporation, alleging violations of the Family Medical Leave Act ("FMLA"). (D.E. 10). This action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. (D.E. 24). Pending is Defendant's Motion for Summary Judgment and the parties' responses and replies. (D.E. 41 and D.E. 43-47). As set forth below, the undersigned recommends the Motion be **GRANTED**. (D.E. 41).

## I.    BACKGROUND

Plaintiff was employed by Defendant as a Pharmacy Informaticist in the Health Informatics Department from June 2013 until his termination on December 16, 2016. (D.E. 41-1, Page 2). During this time, in May 2015, Erica Rangel Chapa, RN ("Chapa")

became Manager of the Health Informatics Department, making her Plaintiff's immediate supervisor.  (D.E. 41-1, Page 2).[1]  Chapa's supervisor during the relevant time period was Lilliana Saucedo ("Saucedo"), the Informatics Divisional Director.  (D.E. 41-1, Page 2).

On June 17, 2016, Leslie Stewart, System Director for Clinical Informatics and Chapa and Saucedo's superior, forwarded to Chapa and Saucedo an email sent by Plaintiff to the Health Informatics Department, but not to Chapa or Saucedo, regarding system performance issues.  (D.E. 41-1, Pages 10-12).  When forwarding the email, Stewart asked both Saucedo and Chapa if they were aware of Plaintiff distributing the email, whether there was a response to the issues presented therein and whether Plaintiff's issues were appropriately escalated.  (D.E. 41-1, Page 11 and D.E. 41-2, Pages 24-25).  Chapa responded to Stewart that Plaintiff's concerns were being addressed and

---

[1] The evidence cited is Chapa's sworn declaration.  (D.E. 41-1, Pages 2-8).  Plaintiff objects to Paragraphs 3, 4, 16 of this declaration.  (D.E. 43).  As to Paragraphs 4 and 16, Plaintiff objects to Chapa's statement to the extent it contains information she was told by third parties.  Defendant responds it is not offering the information told by others to Chapa about Plaintiff's conduct for the truth of the matters asserted but rather to show why Chapa took certain disciplinary actions against Plaintiff.  (D.E. 46).  Therefore, for this purpose, the undersigned recommends Plaintiff's hearsay objections be **OVERRULED**.  Fed. R. Evid. 801(c).  As to Paragraph 3 regarding whether Plaintiff copied his immediate supervisors on an email sent to their supervisor, Defendant has attached a copy of the email in its entirety to the declaration and it includes a listing of everyone to whom it was sent.  (D.E. 41-1, Pages 10-12).  Defendant now stipulates the email speaks for itself regarding its recipients and therefore, the undersigned recommends Plaintiff's objection to this paragraph is moot.  Plaintiff does not dispute the authenticity of the attached email and Chapa is not listed as a recipient of Plaintiff's June 17, 2016 email.  (D.E. 41-1, Page 11).

Defendant objects to Plaintiff's Exhibit D-1 (Plaintiff's Event Summary).  (D.E. D.E. 44-8, Pages 1-11 and D.E. 45, Pages 10-11).  The statement is an unsworn document and is hearsay.  Therefore, the undersigned recommends it not be considered as competent summary judgment evidence.  Defendant further objects to Plaintiff's counsel's fact summary titled Exhibit H.  (D.E. 44-12, Pages 5-17 and D.E. 45, Page 10).  The undersigned has considered the summary only to the extent it cited competent summary judgment evidence.

she had "already spoken to him about his delivery and audience" in an undocumented verbal corrective action.  (D.E. 41-1, Pages 2 and 10 and D.E. 41-2, Pages 24-25).

On July 8, 2016, Plaintiff sent a message using LinkedIn to Dr. Luke Webster, Defendant's Chief Medical Information Officer (CMIO), suggesting several operational changes regarding where to locate new medical clinics.  (D.E. 41-2, Pages 25-26 and 67). Saucedo found Plaintiff's LinkedIn message to be inappropriate because Plaintiff again bypassed the chain of command by failing to address the issue with his immediate supervisors and for giving unsolicited advice to the CMIO.  (D.E. 41-2, Pages 25-26). Therefore, Saucedo requested Chapa address these issues with Plaintiff.  (D.E. 41-1, Page 3 and D.E. 41-12, Page 26).  On July 14, 2016, Chapa attempted to counsel Plaintiff but she asserts Plaintiff was working from home that day without her knowledge, in violation of Defendant's time and attendance policy which allows working from home only with prior approval from a manager.  (D.E. 41-1, Page 3; D.E. 41-2, Page 26; and D.E. 41-2, Pages 40-42).  Plaintiff was aware of this policy but asserts this was an emergency situation because he had been contacted by a pharmacist about a patient safety issue. (D.E. 41-2, Pages 40-43).  However, when asked by Chapa why he was working from home, he did not respond that it was an emergency situation.  (D.E. 41-2, Page 43).  The same day, Chapa unsuccessfully attempted to address with Plaintiff his working from home without permission via Skype and then on the telephone.  (D.E. 41-1, Pages 3 and

14-16 and D.E. 41-2, Pages 40-42).  During the telephone conversation, Plaintiff hung up on Chapa.  (D.E. 41-1, Page 3 and D.E. 41-2, Pages 41-42).[2]

Chapa then issued Plaintiff, pursuant to Defendant's Progressive Discipline Policy, a documented verbal warning for his June 17, 2016 communication described above and a written warning for the July 14, 2016 unauthorized absence and for hanging up on her.  (D.E. 41-1, Pages 3, 17-20 and 22-27).[3]  Both corrective actions were signed by Chapa, Saucedo and Plaintiff on July 18, 2016.  (D.E. 41-1, Pages 23 and 27).

Plaintiff's 16-year-old son was in a car accident on September 11, 2016 and shortly thereafter, his son began suffering from mood changes and manic episodes and he would physically harm himself.  (D.E. 10, Pages 3-4 and D.E. 44-1, Pages 4-5).[4]  Plaintiff asserts his son was later diagnosed with bipolar depressive disorder.  (D.E. 10, Pages 3-4; D.E. 41-2, Pages 62-64 and 69; and D.E. 44-1, Pages 4-5).  Plaintiff discussed his son's

---

[2]During his deposition, Plaintiff stated during this phone call, Chapa "started fussing at me, raising her voice.  I felt like I was her six-year-old son or her hen-pecked husband or something. She continued, got very rude and obnoxious, at which point I hung up on her.  I told her I would talk to her later.  I couldn't communicate effectively with her being out of control like that." (D.E. 41-2, Page 42).

[3]Defendant's Progressive Discipline Policy provides the formal corrective actions steps are: (1) Counseling (2) Warning (3) Final Warning and (4) Termination of Employment.  (D.E. 41-1, Pages 17-20).  The progressive phases of discipline are issuing a (1) Document Verbal Warning (2) a Written Warning (3) a Final Warning and (4) then Termination.  (D.E. 41-1, Page 26). Optional corrective action steps include preparing a Performance Improvement Plan ("PIP"), suspension, administrative leave, or referral to the Employee Assistance Program ("EAP"). (D.E. 41-1, Page 18).  The Policy also lists multiple major offenses that may result in immediate termination without progressive discipline.  (D.E. 41-1, Pages 19-20).

[4]Plaintiff's original action also asserted FMLA claims based upon his own ailments.  (D.E. 1 and D.E. 10).  However, these claims were dismissed and this case was permitted to "proceed on the interference claim related to the son's health condition and on the retaliation/discrimination claim based on an adverse employment decision after seeking FMLA leave, related only to the son's health condition." (D.E. 18, Page 9).

situation with many of his co-workers, including Chapa, and told Chapa that caring for his son, as a single father, was causing him to lose sleep.  (D.E. 10, Page 4 and D.E. 41-1, Page 3).  Just over two weeks after the accident, on September 27, 2016, Chapa met with Plaintiff and Plaintiff indicated he was having difficulty caring for his son.  (D.E. 41-1, Pages 3 and 30).   Chapa told him about Defendant's Employee Assistance Program, which provides counseling and guidance, noted Plaintiff needed to "increase/improve communication" with her and Plaintiff should address any issues or concerns in the standard weekly meeting or, for personal issues, with her privately.  (D.E. 41-1, Pages 3 and 30 and D.E. 44-4, Pages 2-3).   The same day, Chapa also prepared a written performance evaluation of the Plaintiff for the time period of July 1, 2015 to June 30, 2016, giving Plaintiff an overall performance rating of 3.2 out of 4.0.  (D.E. 44-10, Pages 2-11).   Chapa noted Plaintiff needed to improve his email etiquette and should be "mindful of the email recipient distribution list in regards to the content shared and following the proper chain of command hierarchy."  (D.E. 44-10, Page 9).

The next day, on September 28, 2016, Chapa again met with Plaintiff regarding his work, which she found unacceptable for being untimely, incomplete and incorrect. (D.E. 41-1, Page 3).  Chapa, in a document titled "Coaching Document," communicated to Plaintiff that his failure to timely communicate being behind schedule on projects and not providing accurate data was unacceptable.  (D.E. 41-1, Pages 3 and 35).

On November 17, 2016, Chapa became aware of an email, which she found to be unprofessional, that Plaintiff sent to an outside vendor. (D.E. 41-1, Pages 37-38[5] and 55-56). On November 18, 2016, Saucedo and Chapa met with Plaintiff regarding inappropriate communications and problems with email etiquette which resulted in Chapa issuing Plaintiff a Final Corrective Action noting Plaintiff had to "[u]nderstand the audience when using email in addition to the content being shared." (D.E. 41-1, Pages 55-56 and D.E. 44-4, Page 2). Plaintiff was also placed on a Performance Improvement Plan ("PIP") to improve his email etiquette which was reviewed with Plaintiff on December 7, 2016. (D.E. 41-1, Pages 59-63).

In November 2016, when Plaintiff's son was in a hospital in San Antonio, Texas, Chapa arranged for Plaintiff to work out of Defendant's facility in San Antonio. (D.E. 41-1, Page 4). However, Plaintiff did not report to the work location arranged for him as his son was discharged on the day Plaintiff arrived in San Antonio. (D.E. 41-1, Page 4 and D.E. 41-2, Pages 48-49). Around December 1, 2016, Saucedo again informed Plaintiff about the Employee Assistance Program. (D.E. 41-2, Page 27). She also reviewed Defendant's FMLA policy with Plaintiff and reminded him how to request

---

[5]Plaintiff, when asked about the timing of a project, responded in his email:

> I'll do what I can. I already told that woman we needed to push this project back. See, I am a single father with full time custody of my son. My nearest family is 1200 miles away, so it's not necessarily simple. I just got him home from a week in the hospital in San Antonio. So, in addition to the continual demands for production from your company, I have my usual responsibilities to catch up on. At this point, I am still attempting to decipher what it is that this woman wants me to do.

(D.E. 41-1, Pages 37-38).

FMLA leave.  (D.E. 41-1, Page 4; D.E. 41-2, Pages 27-28; and D.E. 44-1, Page 5).[6]  On December 5, 2016, Chapa met with Plaintiff and Plaintiff informed Chapa his son was doing well, better than past weeks.  (D.E. 41-1, Page 65).   They also discussed that Plaintiff did not have enough accrued paid time off ("PTO") to cover the four mandatory days off over the December-January holidays.  (D.E. 41-1, Page 4 and D.E. 41-2, Pages 46-47).   Chapa agreed to allow Plaintiff to work on two of the mandatory PTO days instead of having to take unpaid leave.  (D.E. 41-1, Page 4 and D.E. 44-6, Pages 1-6).

On the morning of December 15, 2016, while she was out of town, Chapa attempted to contact Plaintiff to discuss her concerns that he had allegedly been unavailable to several associates the previous day and was behind on several projects.  (D.E. 41-1, Page 5).  Chapa could not reach him at work and when she reached him via text at 11:37 a.m. to ask if he was at work, he replied, "Well, almost."  (D.E. 41-1, Page 5).  The next day, on December 16, 2016, Chapa again found Plaintiff was not at work and contacted him by email and Skype around 10:45 a.m. but did not receive a response.  (D.E. 41-1, Page 5).  Chapa then sent Plaintiff a message that she and Saucedo had scheduled a mandatory coaching session with Plaintiff for 2:30 p.m. later that afternoon regarding his attendance issues.  (D.E. 41-1, Page 5; D.E. 41-2, Page 29; D.E. 44-9, Pages 8-10).

---

[6]Since June 16, 2013, Liberty Life Assurance Company of Boston ("Liberty") administers Defendant's relevant benefit plans, including Short Term Disability and FMLA leave.  (D.E. 41-3, Page 9).  Plaintiff testified he knew he "needed to go through Liberty Mutual" to submit an FMLA leave request.  (D.E. 44-4, Page 3).

At the meeting, Chapa and Saucedo both described Plaintiff as unreceptive to coaching, noting Plaintiff stated "this is bullshit" and "I can work where I want, when I want," acted agitated and had to have security called to escort him out of the hospital. (D.E. 41-1, Page 5; D.E. 41-2, Pages 29-30 and 33-34).  Plaintiff testified he "wouldn't have used that word.  I would have told her that I didn't agree with it" but does not "recall the specific conversation of what exactly was said."  (D.E. 44-4, Page 8). However, he later testified it was possible he left the meeting and walked out while Chapa and Saucedo were still trying to talk to him.  (D.E. 44-4, Page 21).  Plaintiff further claims he did not yell at any point and was escorted from his desk by security after Saucedo and Chapa placed him on administrative leave.  (D.E. 41-1, Page 5; D.E. 41-2, Page 33; and D.E. 44-4, Pages 8-9).  Later that afternoon, Plaintiff's employment was terminated.  (D.E. 41-1, Page 5 and D.E. 41-2, Pages 2-5).  Plaintiff was formally terminated in the Defendant's system on December 20, 2016 and his personal belongings were sent to him via certified mail, which he received on December 24, 2016.  (D.E. 41-1, Pages 6 and D.E. 41-2, Pages 6, 11-12 and 55).  Defendant asserts Plaintiff was called by human resources and notified of his termination on December 19, 2016 although Plaintiff states he did not receive this call.  (D.E. 44-4, Page 13).

On December 21, 2016, Chapa received a text from Plaintiff showing a picture of a broken doorknob telling her to "be careful."  (D.E. 41-1, Page 6 and D.E. 41-2, Page 18).[7]  Plaintiff asserts he was unaware at that time that he had been terminated and was

_____

[7]The full text message, below the picture of a broken doorknob, said:

"concerned for everyone because, there again, Christmas holidays" and "people break into homes and cars during the holiday seasons and it happened to me." (D.E. 44-4, Pages 10-11). Later the same day, Chapa saw Plaintiff in the hospital parking lot outside her window and Defendant asserts security was notified and prevented Plaintiff from entering the building. (D.E. 41-1, Page 6 and D.E. 41-2, Pages 20-21). Plaintiff asserts he was not approached by security and was there solely to drop off Christmas presents to two of Defendant's employees which he did as they left work and then he left. (D.E. 44-4, Page 11). Plaintiff returned to the hospital again on December 27, 2016, attempted to gain entry to his former workplace and was then issued a Criminal Trespass Warning by hospital security personnel and was escorted off the premises. (D.E. 41-1, Page 6; D.E. 41-3, Page 2 and D.E. 44-4, Pages 12-13). Plaintiff alleges he went there to determine what his employment status was but still did not understand he was fired. (D.E. 44-4, Pages 12-13).

In early 2017, Plaintiff used Facebook messenger to send a message to a Pharmacy Informatics Supervisor named Marvin Skinner which stated:

> Hey- by the way -what's up with this sneak nurse takeover, w 2 or 3 of them trying to put one over on their old antique pharmacist? Especially since I told her that I'd tell her where they screwed up…once, or if, she fixed the screw up. Oh, well. Intentionally refusing to even get me a blasted functional headset was chicken scratch compared to her refusal to acknowledge, much less grant simple accommodation requests…especially considering I'd burned 8 pto days w/ my son hospitalized in San Antonio…and then she'd first said "do FMLA," then "don't worry about it. We'll pay your 1 PTO day, then just not pay for the days you need off for

---

Merry Christmas to you and all! God's love and peace to each. Be careful – Mark opened the door yesterday without looking first – rough looking guy taking a peek, casing it out. (D.E. 41-2, Page 18).

Christmas." Oh, and the fact that I'm missing 3 paychecks, PLUS my - & my son's – insurance was turned off – BEFORE the supposed termination took effect. And yet, premiums were still collected….I just LOVE it. She and her also female Hispanic boss buddy [Chapa and Saucedo] do their retarded write ups, & she says: "Thank you! You just don't know how much WE appreciate it." Well, she DID actually try to have me arrested when I went back up to talk to her. So it's not as if she doesn't care. I did call it around and recommend her for her position, though. THAT was brilliant. No. Actually she has great potential – just overloaded like all of us. Anyway, my son's all better now! Not bipolar-disorder-just some weird neuro stuff from the guy who plowed into him in that wreck 9/11. And SMH did NO neuro/head injury exam, MRI/CT etc. I had to sue Allstate for not paying the wreck claim…plus, that caused job loss (?) No quite sure how to proceed…I'm sure I won't do nothing though.

(D.E. 41-2, Pages 62-64 and 69 and D.E. 44-4, Page 15).

On March 1, 2017, Defendant sent Plaintiff a cease and desist from harassing letter asserting Plaintiff had "inappropriately contacted several" former co-workers after his December 16, 2016 termination. (D.E. 44-9, Page 12).[8]

On January 2, 2018, Plaintiff filed a charge of discrimination with the Texas Workforce Commission alleging he was terminated based on his own disability. (D.E. 41-3, Page 4). This claim was dismissed as untimely on January 10, 2018. (D.E. 41-3, Page 7). Plaintiff filed this action on March 6, 2018. (D.E. 1).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A

---

[8]For example, in February 2017, Plaintiff sent Chapa a text stating, "Hey, what's the plan? Take the money and run? Reapply for my job? Make sure Erica knows I still love her and would let no harm ever come to her or her family, of course" as well as a picture of an open lock box, a passport, a bunch of cash and several pill bottles. (D.E. 44-4, Page 17).

genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp*., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id*. Furthermore, affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Fed. R. Civ. P. 56(c); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (stating courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he

substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998).  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

## III.   ANALYSIS

The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."  29 U.S.C. § 2601(b)(2).  The FLMA prohibits an employer from interfering with, restraining, or denying the exercise or attempted exercise of an employee's right to take FMLA.  29 U.S.C. § 2615(a)(1).  Additionally, the FMLA

prohibits employers from discharging or otherwise discriminating against an individual for opposing any practice made unlawful by the Act.  29 U.S.C. § 2615(a)(2).

### A.    INTERFERENCE

"The term 'interference with' includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  *Bell v. Dallas Cnty.*, 432 F. App'x 330, 334 (5th Cir. 2011) (citations omitted).  A plaintiff must show: (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to FMLA leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied his benefits to which he was entitled under the FMLA. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013)).

The parties do not dispute Plaintiff was an eligible employee entitled to take FMLA leave or that Defendant was subject to FMLA requirements.  Therefore, the undersigned focuses on whether Plaintiff has demonstrated that he gave Defendant proper notice of his intent to take FMLA leave relating to his son's medical conditions and whether Defendant denied Plaintiff an FMLA benefit to which he was entitled. "Although an employee need not use the phrase 'FMLA leave,' she must give notice that is sufficient to reasonably apprise her employer that her request to take time off could fall under the FMLA."  *Lanier*, 527 F. App'x at 316.  The Fifth Circuit "does not apply categorical rules for the content of the notice" and instead focuses on what is "'practicable' based on the facts and circumstances of each individual."  *Id*. (citing

*Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762-64 (5th Cir. 1995)); *see also* 29 C.F.R. § 825.303(b). "The employer is not required to be clairvoyant," but "may have a duty to inquire further if statements made by the employee warrant it." *Id.* (citing *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998)). "Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(b).

Additionally, whether leave is foreseeable or unforeseeable, an employee must comply with the employer's customary procedural requirements for requesting leave. 29 C.F.R. § 825.302(d); *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 790 (5th Cir. 2006) (citation omitted). "This regulation 'explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances.'" *Id.* (citation omitted) ("Even when an employee's need for leave is unforeseeable, the regulations make it clear the employee's duty is to comply with the employer's policy.") "[A]n employer generally does not violate the FMLA if it terminates an employee for failing to comply with a policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA*." *Id.* at 789 (emphasis in original) (citations omitted).

Defendant maintains Plaintiff did not comply with its procedure for taking FMLA leave. During his deposition, when asked when he requested to take FMLA leave, he responded:

> Erica [Chapa] and I were trying to figure out how to get by without my having to take FMLA leave.  That was both of our goal.  I didn't want to have to miss work, but the issues with Mark had gotten so bad, I didn't actually follow through with the next steps in taking FMLA.  Of course, I would have needed to have gotten documentation from his physician if I was taking FMLA on his behalf.  So, at one point, I believe at the meeting…I was saying, "I think I need to take FMLA.  Mark is keeping me up all night."  She [Chapa] mentioned that in that performance review but didn't give any details, of course, due to patient privacy concerns; and, at one point, I met with her about that, and she just said, "Don't worry about it.  I'll fix it."  I didn't have enough PTO time to take the mandatory holidays for Christmas and New Year's.

(D.E. 41-2, Pages 46-47).

Plaintiff further stated, when asked if he understood he did not have to have accrued

PTO to take FMLA leave and he had been communicating with Liberty Mutual:

> Well, my thought – I mean, Erica [Chapa] and I both were trying to avoid the need for me to take FMLA leave because we had the three big projects…[s]o I was concerned that if I was missing work, that the pump purchase would fall through because we wouldn't get those pumps – the new pumps programmed when they are delivered and brought on line.

(D.E. 41-2, Page 47).

Plaintiff further stated he was aware he had to submit an FMLA leave request

through Liberty but never had an FMLA leave request denied before he was terminated

because:

> I didn't proceed with the process because they were trying to complete these projects.  I needed FMLA.  I was trying to work with Erica [Chapa] to figure out how to either take FMLA or work it out with my PTO time, such that I could be available to complete these projects.  I was terminated after I made the FMLA request.

(D.E. 44-4, Page 3).

Plaintiff's failure to comply with Defendant's procedures for requesting FMLA leave precludes him from invoking FMLA protection.  Although Plaintiff was provided with FMLA resources at least twice by Chapa and Saucedo before his termination in December 2016, the summary judgment evidence establishes Plaintiff never initiated a request for FMLA leave with Liberty, the company administering Defendant's FMLA leave, before he was terminated.[9]  Plaintiff acknowledged in his deposition that Defendant informed him of his right to take FMLA leave and the proper procedures to do so but he did not follow company procedure and actually request FMLA leave because of his son's ailments prior to his termination.  *Acker*, 853 F.3d at 789 (Employers have a legitimate business interest in requiring employee to follow it's FMLA notice of absence procedures to ensure "it has an adequate workforce to carry out its normal operations") (citation omitted).

---

[9]Almost a year after his termination, in November 2017, Plaintiff submitted an FMLA request to Liberty related solely to his own alleged disability, not his son's.  (D.E. 41-3, Pages 9-36).  This request was denied as Plaintiff had been terminated for almost a year before it was made.  During his deposition and in his response to the pending Motion, Plaintiff asserts he filed an FMLA leave request with Liberty in November 2016 related to his own health issues.  (D.E. 44-1, Pages 6-7).  In support, he produced two releases he signed at the Corpus Christi Pain Medicine office to release his own medical records to Liberty Mutual.  (D.E. 41-2, Pages 46-47 and D.E. 44-1, Pages 13-18).  However, there is no evidence these releases were ever sent or received by Liberty as the records submitted by Liberty include only one release signed by Plaintiff in November 2017.  The records submitted by Liberty further indicate Plaintiff initiated a claim one year later, on November 2017, related solely to his own ailments.  Additionally, relevant to this action, Plaintiff never initiated an FMLA claim with Liberty related to his son's health condition. (D.E. 41-2, Pages 46-47).  The undersigned also notes that the 2017 release Liberty produced is identical to the one produced by Plaintiff except the release produced by Liberty has a specific date line indicating Plaintiff signed it on November 27, 2017 whereas the release produced by Plaintiff has the date line removed and instead, has the date listed as approximately one year earlier, November 29, 2016 listed next to  Plaintiff's signature.  (D.E. 41-3, Page 24 and D.E. 44-1, Page 13).

Further, to the extent Plaintiff alleges Defendant violated the FMLA by not permitting him to work from home, the FMLA provides an employee is entitled to take leave, not to work from home. *Garcia v. Penske Logistics, L.L.C.*, 631 F. App'x 204, 212 (5th Cir. 2015) (citations omitted).  Additionally, while Plaintiff, in his response, asserts he should not have been disciplined for failing to show up to work or for being late to work because "it was due to caring for his son," the FMLA does not provide protection for employees who violate an employer's attendance policies rather than take unpaid FMLA leave, even if the absences would have been protected. *Acker*, 853 F.3d at 789-90.  Further, Plaintiff has not presented sufficient evidence that Defendant discouraged him from taking FMLA leave.  The record demonstrates Plaintiffs' supervisors met with Plaintiff and gave him the relevant FMLA information, including the process to request it, of which Plaintiff acknowledges he was aware.  Plaintiff has introduced no evidence that he ever chose not to take leave for fear of discipline.  While Plaintiff states he was attempting to work with his supervisors to avoid taking FMLA leave, he has presented no evidence he was discouraged from taking FMLA leave.  That he was disciplined for unexcused absences or for being late is insufficient even if they were caused by his need to care for his son. *Acker*, 853 F.3d at 789.

Therefore, it is respectfully recommended the competent summary judgment evidence does not support a claim of FMLA interference because Plaintiff did not give Defendant proper notice of his intent to take FMLA leave and was, therefore, never denied such leave.

**B.   RETALIATION**

The "FMLA…protects employees from retaliation or discrimination for exercising their rights under the FMLA." *Mauder v. Metro. Transit Auth. of Harris Cnty.*, 446 F.3d 574, 580 (5th Cir. 2006); 29 C.F.R. § 825.220(c).   To establish a *prima facie* case of FMLA retaliation, Plaintiff must show he: (1) was protected under the FMLA; (2) suffered an adverse employment action; and (3)(a) was treated less favorably than a similarly situated employee who had not requested leave or (b) the adverse decision was made because he took FMLA leave.   *Acker*, 853 F.3d at 790 (citation omitted).[10]   "The third element requires the employee to show 'there is a causal link' between the FMLA-protected activity and the adverse action."   *Acker*, 853 F.3d at 790 (citation omitted). Once an employee succeeds in making a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action taken against the Plaintiff.   *Garcia*, 631 F. App'x at 211-12.   If Defendant satisfies this burden, the burden shifts back to the employee who must prove the legitimate reasons offered by the Defendant were not its true reasons but were a pretext for retaliation or discrimination.   *Id.* (citations omitted).

The parties do not dispute Plaintiff was protected by the FMLA or he was terminated.   Rather, Defendant asserts Plaintiff has produced no evidence he was fired because he inquired about and/or requested FMLA leave.   Defendant maintains Plaintiff

---

[10]This Court has previously dismissed any claim that Plaintiff was treated less favorably because it was not adequately pled.   (D.E. 19, Pages 8-9).   Therefore, Plaintiff must demonstrate the adverse decision was made because he requested FMLA leave.

was ultimately terminated as a result of his behavior during the December 16, 2016 meeting with Chapa and Saucedo, along with his previous history of both verbal and written warnings as described above.   The undersigned notes Plaintiff's history of progressive discipline began in June 2016, well before Plaintiff's son's car accident in September 2016.   Further, in his deposition, Plaintiff testified he received discipline, not because he requested FMLA leave, but because Chapa did not like him because she was upset he made her look bad, thought he was stupid and did not like him.   (D.E. 41-2, Pages 44-45 and D.E. 44-4, Page 6).

Plaintiff asserts his termination within a month of his inquiry regarding FMLA leave is close enough to establish a causal link.   To establish a causal link, Plaintiff's burden is light, meaning he has to show the protected activity and the adverse employment action are not "completely unrelated" and the Court considers the "temporal proximity" between the FMLA leave and the adverse action.   *Mauder*, 446 F.3d at 583-84 (citations omitted).   However, as in *Mauder*, Defendant "was not required to suspend [Plaintiff's] termination pending his FMLA filing" when "he had already been on corrective action" prior to his even mentioning FMLA leave.   *Id*. at 583-85; *Harville v. Texas A&M Univ.*, 833 F. Supp. 2d 645, 658-59 (S.D. Tex. 2011) (When an employee with documented disciplinary problems produces no evidence to show "the same actions would not have been taken against her had she not taken FMLA leave," temporal proximity alone is insufficient to establish retaliation).   In short, Plaintiff's assertions are conclusory and he has produced no evidence in the record he was terminated because he

inquired about and/or requested FMLA leave related to his son's ailments. Temporal proximity alone is insufficient.

Further, even if Plaintiff had made a *prima facie* showing of retaliation, Defendant asserts the employment decisions made were motivated solely by Plaintiff's work-related conduct, including his poor attendance, poor communication, and for insubordination and a disrespectful attitude toward Chapa and other supervisors. (D.E. 41-1, Page 6). The undersigned recommends Defendant has carried its burden of articulating legitimate, non-discriminatory reasons for its decision to discharge Plaintiff, specifically his performance, communication and attendance issues as well as his unprofessional actions toward his two direct supervisors, Chapa and Saucedo, which are well-documented beginning in June 2016, months before Plaintiff's son's September 2016 accident. Chapa followed Defendant's progressive corrective action policy by coaching and issuing both verbal and written warnings to Plaintiff over a period of several months before the need for FMLA leave was ever discussed. (D.E. 41-1, Pages 3, 17-20 and 22-27).

Plaintiff has offered no competent summary judgment evidence demonstrating Defendant's stated reasons are pretext. To the extent Plaintiff argues his supervisors' decisions were incorrect, "[t]he question is not whether the employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason.") The undersigned recommends Plaintiff has failed to provide any sufficient evidence of

discriminatory motive in this instance. *Garcia*, 631 F. App'x at 212 (citation omitted) (Although Plaintiff assumes his firing was in retaliation, this subjective belief without more is insufficient to cast doubt on Defendant's proffered reason for his termination).

## IV.    CONCLUSION

For the reasons stated above, the undersigned recommends Defendant's Motion for Summary Judgment be **GRANTED**.

ORDERED this 13th day of June, 2019.

Jason B. Libby
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).